SOUTHWEST CENTER FOR BIOLOGI-
CAL DIVERSITY, a non-profit cor-
poration, Plaintiff–Appellant,

Arizona Power Authority; Metropolitan
Water District of Southern California;
Southern Nevada Water Authority; Salt
River Valley Water Users Association;
Salt River Project Agricultural Improve-
ment And Power District, Intervenors–
Appellees,

and

State of Arizona; Rita P. Pearson; State
of Colorado; State of New Mexico;
State of Utah; State of Wyoming; State
of Nevada; Defenders of Wildlife, By
Special Appearance,

v.

U.S. BUREAU OF RECLAMATION;
Bruce Babbitt, Secretary of the
Interior, Defendants–Appellees.

SOUTHWEST CENTER FOR BIOLOGI-
CAL DIVERSITY, a non-profit cor-
poration, Plaintiff–Appellee,

State of Arizona; State of Colorado; State
of New Mexico; State of Utah; State of
Wyoming; State of Nevada, Appellants
By Special Appearance,

and

Arizona Power Authority; Rita P. Pear-
son; Metropolitan Water District Of
Southern California; Defenders of Wild-
life; Southern Nevada Water Authority;
Salt River Valley Water Users Associa-
tion; Salt River Project Agricultural
Improvement and Power District, Inter-
venors,

v.

U.S. BUREAU OF RECLAMATION;
Bruce Babbitt, Secretary of the
Interior, Defendants.

Nos. 97–16768, 97–17110.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 9, 1998.

Decided May 4, 1998.

Travis Stills, Durango, Colorado, Eric R. Glitzenstein, Meyer & Glitzenstein, Washington, DC, for plaintiff-appellant/appellee Southwest Center for Biological Diversity.

James P. Bartlett, Phoenix, Arizona, for intervenor-appellee Arizona Power Authority; Howard B. Golds, Gregory K. Wilkinson, Best Best & Krieger, Riverside, California, for intervenor-appellee Metropolitan Water District of Southern California; David E. Lindgren, Downey, Brand, Seymour & Rohwer, Sacramento, California, for intervenors-appellees Southern Nevada Water Authority and Salt River Project; David C. Shilton, Samuel D. Rauch, III, Department of Justice, Washington, D.C., for defendants-appellees Federal Government.

Carol D. Angel, Assistant Attorney General State of Colorado, Michael Pearce, Arizona Dept. of Water Resources, Phoenix, Arizona, James H. Davenport, Office of the Attorney General, Las Vegas, Nevada, for appellants by special appearance States of Arizona, California, Colorado, Nevada, New Mexico, Utah and Wyoming.

Before: GOODWIN, KOZINSKI, and THOMPSON, Circuit Judges.

GOODWIN, Circuit Judge:

These consolidated appeals arise out of a controversy over an endangered subspecies of songbirds and the management of the waters of the Colorado River impounded behind a multipurpose Dam. ·

Southwest Center for Biological Diversity ("Southwest") brought suit against Bruce Babbitt, the Secretary of the Interior ("the

Secretary"), and the United States Bureau of Reclamation ("Reclamation"), alleging violations of the Endangered Species Act ("ESA"). The district court dismissed Southwest's suit against Reclamation, ruling that Southwest did not satisfy jurisdictional pre-suit notice requirements. The district court then granted summary judgment in favor of the Secretary, concluding that the Secretary did not violate any provisions of the ESA. Having disposed of the case, the district court denied as moot the indispensable party motions raised by the states of Arizona, California, Colorado, Nevada, New Mexico, Utah, and Wyoming ("the States"). Plaintiffs, intervenors, and the States appeal. We have jurisdiction to review this case under 28 U.S.C. § 1291 and 5 U.S.C. § 701 *et seq.* We affirm.

## I. BACKGROUND

### A. *Factual and Procedural History.*

In dry years, the Lake Mead delta ("the delta") which is exposed by low water impounded by Hoover Dam on the Lower Colorado River has provided a popular nesting ground for the Southwestern Willow Flycatcher ("the Flycatcher"), a migratory songbird which nests and breeds during spring and summer in dense cottonwood-willow riparian habitat. The bird has been "listed" by the Fish and Wildlife Service ("the FWS") as an endangered species under the ESA. Although periodically submerged by rising water during Reclamation's normal operations of the Hoover Dam and the Lower Colorado River, the delta experiences natural drying periods when upstream rain and snow conditions drop below normal.

In the late 1980s and early 1990s dry weather caused the water level to drop and encouraged expansion of the riparian growth of willow trees. This willow tree growth has gradually expanded to cover approximately 1,148 acres and now forms the second largest continuous patch of native willow habitat known to exist in the Southwest. More recently, however, the return of normal rainfall and runoff on the Colorado has caused the water impounded at Lake Mead to rise back to its normal levels, inundating the root crowns of the willows in the delta. Although

the willows have shown resiliency to inundation for periods of over 13 months, the extended inundation of the delta has caused a loss of willows and cottonwoods. Continued inundation will result in the destruction of both the willows and cottonwoods. As the willow-cottonwood habitat is destroyed, Flycatcher nests and young have been, and will likely continue to be, lost.

In 1995, Reclamation began the process of consulting with the Fish and Wildlife Service ("FWS") pursuant to the ESA over the effects of its activities on the Lower Colorado River as they related to the Flycatcher and several other endangered species. Section 7 of the ESA requires each federal agency "to insure that any action authorized, funded or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). Section 7 also requires a federal agency to consult with the Secretary if an agency action may affect a listed species. 16 U.S.C. §§ 1536(a)(2) and 1536(a)(3). *See also* 50 C.F.R. §§ 402.10, 402.13, and 402.14 (1998).

Following informal consultation, in August of 1996, Reclamation issued its biological assessment of the effects its operations were having on threatened and endangered species on the Lower Colorado River. *See* 50 C.F.R. § 402.12 (1998). Reclamation reported that its actions were affecting listed species, including the Flycatcher. In fact, direct take of Flycatchers due to water management had occurred at the Lake Mead delta in June of 1996 when willows subjected to prolonged inundation of root crowns lost the structural support of their root systems and fell into Lake Mead.

Approximately five months later, in January of 1997, the FWS, as the Secretary's special designee, issued a Biological Opinion ("BO") which concluded that Reclamation's continued operations on the Lower Colorado River for the next five years would jeopardize the continued existence and survival of the Flycatcher. *See* 16 U.S.C. § 1536(b); 50 C.F.R. §§ 402.02 and 402.14(h)(1998). In this BO, which was sent to Reclamation for comments, the FWS noted that, in light of the Flycatcher's status and riparian habitat

on the Lower Colorado River, the expected loss of habitat from Reclamation's continued activities at Lake Mead would prove catastrophic, both in the amount of Flycatcher habitat involved and the potential rate of loss. The FWS elaborated that there was an urgent need to protect breeding flycatchers and their habitat at Lake Mead.

The FWS then proposed a reasonable and prudent alternative ("RPA") which would permit Reclamation to continue its operations on the Lower Colorado River while still avoiding jeopardy to the Flycatcher. 16 U.S.C. § 1536(b)(3)(A). *See also* 50 C.F.R. § 402.14(h)(1998). The proposed RPA was comprised of many short and long-term components. The first short-term provision of the RPA required Reclamation to use the full scope of its authority and discretion to immediately protect and maintain the 1,148 acres of riparian habitat at the delta. Reclamation was further required to provide the FWS with a detailed account of the type and extent of discretion available to it in the management of Lake Mead. If Reclamation was unable to implement this provision throughout the five-year consultation period, Reclamation was required to defer use of conservation space above elevation 2136 at Roosevelt Lake, Arizona, in order, in the short-term, to maintain Flycatcher habitat there until suitable flycatcher habitat could be developed elsewhere. The FWS issued a briefing statement on January 21, 1997, discussing the draft RPA. The FWS acknowledged that the proposed RPA actions for the Flycatcher were burdensome, but insisted that the actions were, at the time, considered the absolute minimum necessary to alleviate jeopardy.

After receiving the draft BO, the Regional Director of Reclamation sent a memorandum advising the Secretary that it should not be compelled to preserve any of the Lake Mead Flycatcher habitat because it lacked discretion to reduce the level of Lake Mead except for purposes of river regulation, improvement of navigation, flood control, irrigation, domestic uses, and power generation.

On April 30, 1997, the FWS issued its Final BO in which it confirmed that Reclamation's operation of Hoover Dam and Lake Mead over the next five years would place the Flycatcher in jeopardy. The FWS stated that the expected loss remained catastrophic and that there existed a critical need to protect breeding Flycatchers and their habitat at Lake Mead. The FWS admitted that extinction of the Flycatcher was foreseeable. The FWS nevertheless proposed a new RPA which no longer required Reclamation to take action to protect the habitat at the Lake Mead delta, because of its alleged lack of discretionary power to do so. This RPA further did not require Reclamation to defer use of conservation space above elevation 2136 at Roosevelt Lake, Arizona, in order, in the short-term, to maintain Flycatcher habitat there until suitable Flycatcher habitat could be developed elsewhere.

Instead, this RPA announced such short term mitigation measures as immediately initiating a program to procure and protect alternative compensation habitat. Specifically, the RPA required Reclamation to procure and protect approximately 1,400 acres of currently unprotected riparian habitat that is currently used by the Flycatcher, preferably on the Lower Colorado River. However, if insufficient occupied habitat could be identified, the RPA permitted Reclamation to instead procure and protect high potential, unoccupied habitat. All the required protections for at least 500 acres had to be put in place by January 1, 1999, including initiation (not completion) of any necessary ecological restoration or reforestation. All the required protection for the remaining acres had to be put in place by January 1, 2001.

The FWS did not identify specific areas available and suitable for acquisition and restoration, and did not mandate that the replacement habitat be established at a date certain before the destruction of the Lake Mead Habitat. The FWS, in adopting the RPA, did, however, expect the short-term mitigation measures, including habitat replacement, to be complemented by long-term mitigation measures, such as (1) an additional program of on and off-site compensation for historical Flycatcher habitat that represents the amount of historical Flycatcher habitat lost or precluded from developing because of the continuing effects of Reclamation's facili-

ties, and (2) the continued development of the Multi–Species Conservation Program ("MSCP").[1] In fact, the FWS concluded that jeopardy to the Flycatcher could be avoided only if the long-term provisions were carried out. The RPA and Final BO were accompanied by an incidental take statement, in which the Secretary permitted an "unquantifiable" take of the Flycatcher at the Lake Mead Delta.

Sometime before this Final BO was issued, when it became clear to Southwest that no steps were being taken to preserve the Lake Mead habitat, Southwest initiated this lawsuit against Reclamation. As originally filed, the complaint charged that Reclamation was violating (1) 16 U.S.C. § 1536(d) by allowing continued inundation of the Lake Mead Delta before the completion of formal consultation; (2) 16 U.S.C. § 1536(a)(2) by allowing its operations to jeopardize the Flycatcher, and (3) 16 U.S.C. §§ 1538(a)(1)(B) and 1539(a) by "taking" Flycatchers in the Lake Mead delta without a valid incidental take statement.

Southwest also sought injunctive relief, asking the court to issue an order forcing Reclamation to lower Lake Mead to approximately 1178 feet above sea level in order to preserve the Lake Mead delta habitat. Reclamation responded by filing a motion to dismiss the complaint, arguing that Southwest failed to provide the requisite pre-suit notice necessary to invoke the court's jurisdiction over Reclamation under the citizen suit provision of the ESA.

Arizona Power Authority, the Metropolitan Water District of Southern California, the Salt River Project, and the Southern Nevada Water Authority filed motions to intervene as defendants. They argued that a reduction in the water level of Lake Mead to save the willow trees would ultimately require the release of 3.5 million to 5 million acre feet of water, and would harm the persons and entities who rely on Lake Mead water for domestic, power, and irrigation purposes. The district court granted the motions for intervention.

After the final BO was issued, and three days prior to the hearing on the motion for preliminary injunction and the motion to dismiss, Southwest amended its complaint to add a claim against the Secretary under the Administrative Procedure Act ("APA"), challenging the adopted RPA as arbitrary, capricious, and contrary to the ESA. Southwest also deleted its claim against Reclamation that it was violating the ESA by allowing continued inundation of the Lake Mead Delta before the completion of formal consultation. Nevertheless, Southwest continued its claims against Reclamation that it was violating the ESA by jeopardizing the continued existence of the Flycatcher and by unlawfully taking Flycatchers at Lake Mead in the absence of a valid RPA and incidental take statement.

On June 19, 1997, the district court dismissed the claims brought against Reclamation for lack of subject matter jurisdiction after finding Southwest had not complied with the notice requirements under the citizen suit provision of the ESA. The district court consequently denied Southwest's preliminary injunction motion which would have forced Reclamation to lower the level of Lake Mead.

Southwest then filed a motion for summary judgment on its remaining claims against the Secretary. The Secretary responded by filing a cross-motion for summary judgment on the basis that the reasonable and prudent alternative set forth in the Final BO was not likely to jeopardize the continued existence of the Flycatcher species. On August 22, 1997, the district court rejected Southwest's allegations that the Final BO and its RPA were arbitrary and capricious or an abuse of discretion and that the final BO and RPA violated the ESA by not avoiding jeopardy to the Flycatcher. Accordingly, the district court granted summary judgment in favor of the Secretary, and denied Southwest's motion for summary judgment.

The States of Arizona, California, Colorado, Nevada, New Mexico, Utah, and Wyoming ("the States") have filed a brief by

---

1. The MSCP is a cooperative Federal–Lower Basin States–Tribal–Private effort to conserve ESA-listed and sensitive species dependent on the river while accommodating current water diversions and power production. The MSCP is intended to formulate and implement protections beyond the five-year time frame of the BO.

special appearance claiming Southwest's suit should have been dismissed for failure to join them as indispensable parties. The States previously entered special appearances in the district court, expressly reserving their sovereign immunity under the Eleventh Amendment to the United States Constitution. Before the district court, the States argued that they were necessary parties to the extent that Southwest sought injunctive relief compelling the release of water from Lake Mead to the detriment of the States' legal entitlements to, or interests in, such water. Notwithstanding their argument that they were necessary parties, the States asserted that they could not be joined in the action because of their Eleventh Amendment immunity. As indispensable parties, the States argued, their absence from the case precluded judicial consideration of any drawdown of Lake Mead.

In orders filed June 19, 1997 and July 17, 1997, the district court denied the States' indispensable party motions as moot because the court had already dismissed the original complaint against Reclamation and denied Southwest's motion for preliminary injunction.

In its August 22, 1997, summary judgment order disposing of Southwest's remaining claims against the Secretary, the district court again denied as moot the States' renewed indispensable party motions. The States filed a notice of appeal which was consolidated with Southwest's appeal on December 10, 1997.

## II. ANALYSIS

### A. *Dismissal of Claims against Reclamation.*

We must review as a question of law the district court's conclusion that it lacked subject matter jurisdiction over the claims made by Southwest against Reclamation. *Washington Trout v. McCain Foods, Inc.*, 45 F.3d 1351, 1353 (9th Cir.1995).

■ Pursuant to section 1540(g) of the ESA, a citizen may not bring suit prior to sixty days after written notice of an alleged violation has been given to the Secretary, and to the alleged violator. 16 U.S.C. § 1540(g)(2)(A)(i). This sixty-day notice requirement is jurisdictional. *Save the Yaak Committee v. Block*, 840 F.2d 714, 721 (9th Cir.1988). A failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA. *Lone Rock Timber Co. v. U.S. Dept. of Interior*, 842 F.Supp. 433, 440 (D.Or.1994). *See also Hallstrom v. Tillamook County*, 493 U.S. 20, 26–28, 110 S.Ct. 304, 308–10, 107 L.Ed.2d 237 (1989)(holding that the citizen suit notice requirements cannot be avoided by employing a flexible or pragmatic construction and that plaintiff's suit must be dismissed where plaintiff had not strictly complied with the notice requirements).

"The purpose of the 60–day notice provision is to put the agencies on notice of a perceived violation of the statute and an intent to sue. When given notice, the agencies have an opportunity to review their actions and take corrective measures if warranted. The provision therefore provides an opportunity for settlement or other resolution of a dispute without litigation." *Forest Conservation Council v. Espy*, 835 F.Supp. 1202, 1210 (D.Id.1993), *aff'd*, 42 F.3d 1399 (9th Cir.1994). *See also Hallstrom*, 493 U.S. at 29, 110 S.Ct. at 310 (discussing the importance of giving sufficient notice of an alleged violation before bringing a citizen suit under an environmental statute in order to allow the agency to bring itself into compliance with environmental laws, or alternatively, to allow the Secretary to take action to bring the agency into compliance); *Washington Trout*, 45 F.3d at 1354 (stating the purpose of the notice provision is "to allow the parties time to resolve their conflicts in a nonadversarial time period," because once a suit is filed, "positions harden and compromise is less likely").

■ In this case, the district court found that the three letters relied on by Southwest to meet the notice requirements of § 1540(g) were inadequate. Although the letters were sent to the proper parties and were sent sixty days prior to the filing of suit as required under the citizen suit provision, the court found that they failed to sufficiently alert the Secretary and Reclamation to the actual violation Southwest alleged in the complaint it eventually filed-namely that Rec-

lamation's operations at Lake Mead were violating the ESA by jeopardizing the continued existence of the Flycatcher and unlawfully taking Flycatchers in the absence of a valid RPA and incidental take statement. A careful review of the three letters relied on by Southwest to meet the notice requirements shows that the district court's finding was proper.

The first letter was sent by Southwest to both the Secretary and Reclamation on December 11, 1995. This letter explicitly stated it was to serve as the required sixty-day notice of an intent to sue the U.S. Department of Interior, Reclamation, the FWS, and other DOI agencies, as well as the States of Arizona, California, and Nevada. The letter indicated that the proposed defendants violated the ESA by establishing and implementing a Memorandum of Agreement ("MOA") for Development of a Lower Colorado River Species Conservation Program. Specifically, the letter complained that the MOA improperly failed to provide for the conservation of federally listed species on the Lower Colorado River, failed to prevent the destruction and adverse modification of critical habitat on the Lower Colorado River, and unlawfully predetermined the reasonable and prudent measures and alternatives for all projects (current and future), outside and prior to, individual consultation. This letter only criticized the establishment and implementation of the MOA. It failed to mention anything about the Flycatcher habitat at the Lake Mead delta or the jeopardy Reclamation's operations at Hoover Dam posed to the continued existence of the Flycatcher.

The second letter was sent by Southwest to the Secretary and Reclamation on December 18, 1995, and also indicated that it was to serve as the required sixty-day notice of an intent to sue Reclamation. This letter complained that Reclamation was violating the ESA by (1) failing to enter into formal consultation with the FWS on the effect of its Lower Colorado River operations on listed threatened and endangered species, (2) failing to prepare a biological assessment in association with the required consultation, and (3) effecting an illegal "take" of listed species. Much like the first letter, this letter said nothing about the Flycatcher or Southwest's intention to sue Reclamation based on the effects its operations were having on the Flycatcher habitat at the Lake Mead delta.

The third letter was sent to the Secretary and Reclamation on February 6, 1996. This time, the letter was sent by another environmental group, the Defenders of Wildlife. This letter stated it was to serve as notice of an intent to sue the Department of the Interior and its constituent agencies, including the FWS and Reclamation, for Reclamation's violation of the language and intent of the ESA in executing and implementing the MOA and Reclamation's failure to comply with the consultation duties set forth in the ESA with respect to Reclamation's activities on the Lower Colorado River. The letter mentioned that the Lower Colorado River provides habitat for many endangered species, including the Flycatcher, but again, it did not alert the Secretary or Reclamation to the possibility of a suit over the effects of Reclamation's continued operations at Hoover Dam on the survival of the Flycatcher species.[2]

Because none of these letters informed the Secretary and Reclamation that Southwest had a grievance about the Flycatcher habitat at the Lake Mead delta, neither party was able to resolve that particular grievance in the litigation-free window provided for under the ESA notice provision. At most the three letters notified the Secretary and Reclamation that Southwest (1) desired consultation over Reclamation's operations in the Lower Colorado River and (2) felt that the MOA should be invalidated because it contravened the policies and dictates of the ESA.

**2.** Intervenors-appellees also make the argument that the third letter fails to satisfy the notice requirement because it was not sent by plaintiff Southwest, but by a nonparty to the suit. The intervenors base their argument on the decision in *Washington Trout*, 45 F.3d at 1354, in which the court held that a failure to name environmental organizations as plaintiffs in the notice letter deprived the district court of subject matter jurisdiction over those environmental organizations. We need not reach this argument, however, because the letter is already deficient for failing to give notice of the actual violation relied on in issuing the complaint.

Southwest contends that under the plain terms of the ESA, it was not required to list every specific aspect or detail of every alleged violation relied upon in the complaint or to describe every ramification of every alleged violation. *See Public Interest Research Group v. Hercules, Inc.*, 50 F.3d 1239, 1248 (3rd Cir.1995). At a minimum, however, Southwest was obligated to provide sufficient information of a violation so that the Secretary or Reclamation could identify and attempt to abate the violation. *Id.* at 1249. Because Southwest failed to do so here, the district court had no choice but to dismiss the complaint against Reclamation for lack of subject matter jurisdiction.[3]

### B. *Dismissal of the States' Indispensable Party Motions as Moot.*

■ We must review as a question of law the district court's denial of the States' indispensable party motions as moot. *Native Village of Noatak v. Blatchford*, 38 F.3d 1505, 1509 (9th Cir.1994).

As noted earlier, the States argued that because Southwest sought a judicial order mandating the immediate release of 3 to 5 million acre-feet of water from Lake Mead, they had a right to participate as indispensable parties under Rule 19 of the Federal Rules of Civil Procedure. No one questions that the States have an interest in the water at Lake Mead. However, once Reclamation was no longer subject to an order to spill water, the States' claim became hypothetical and moot as a matter of law. The district court correctly refused to reach the merits of the States' arguments after dismissing Southwest's complaint against Reclamation for lack of subject matter jurisdiction based on Southwest's failure to satisfy the notice requirements of the citizen suit provision under the ESA.

### C. *Summary Judgment in favor of the Secretary.*

■ The issuance of the BO, RPA, and Incidental Take Statement by the Secretary,

through the FWS, constituted final agency action pursuant to 16 U.S.C. § 1536. Such administrative actions are, when final, subject to judicial review. However, because the ESA makes no specific provision for judicial review of final agency actions, the scope of review was governed by the APA, 5 U.S.C. § 701 *et seq. See Bennett v. Spear*, —— U.S. ——, ——, 117 S.Ct. 1154, 1167, 137 L.Ed.2d 281 (1997). The district court had to determine whether the Secretary's decision to adopt the BO, RPA and Incidental Take Statement in this case was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The district court found that the Secretary's decision was not arbitrary, capricious, an abuse of discretion, or otherwise inconsistent with the law. *Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*, 898 F.2d 1410, 1414 (9th Cir.1990). Accordingly, the district court granted summary judgment in favor of the Secretary. Again, we review as a question of law the district court's grant of summary judgment in favor of the Secretary. *Swanson v. U.S. Forest Service*, 87 F.3d 339, 343 (9th Cir.1996).

■ Southwest argues on appeal that the Secretary improperly rejected the draft RPA in favor of the final RPA, which does not preserve the Lake Mead habitat, based on Reclamation's alleged lack of discretion to lower the level of Lake Mead. Southwest complains that the Secretary never independently reviewed Reclamation's representation that it lacked such discretion. Southwest goes on to argue that the district court erred in holding that Reclamation's alleged lack of discretion was immaterial to its review of the Secretary's conduct under the APA.

■ We find Southwest's arguments problematic in several respects. First of all,

---

**3.** A fourth letter was sent to the FWS on February 15, 1997. This letter did state Southwest intended to sue Reclamation because Reclamation's operations of Hoover Dam at Lake Mead were jeopardizing the continued existence of the Flycatcher. However, this letter failed to meet the notice requirements of the citizen suit provision of the ESA because it was not sent to the Secretary or to Reclamation. *See Save the Yaak*, 840 F.2d at 721. Southwest conceded that this letter was not sufficient to provide the requisite notice under 16 U.S.C. § 1540(g).

under the ESA, the Secretary was not required to pick the first reasonable alternative the FWS came up with in formulating the RPA. The Secretary was not even required to pick the best alternative or the one that would most effectively protect the Flycatcher from jeopardy. *See Center for Marine Conservation v. Brown,* 917 F.Supp. 1128, 1143 (S.D.Tex.1996)(holding that "[t]he agency's decision need not be ideal ... so long as the agency gave at least minimal consideration to the relevant facts contained in the record"). The Secretary need only have adopted a final RPA which complied with the jeopardy standard and which could be implemented by the agency.

■ Secondly, under the ESA, the Secretary was not required to explain why he chose one RPA over another,[4] or to justify his decision based solely on apolitical factors.[5] Accordingly, the district court had no reason to address the possible factors that might have motivated the Secretary in rejecting the draft RPA or to address the merits of Southwest's argument that the Secretary improperly rejected the draft RPA based on Reclamation's bare assertion that it lacked the discretion to lower the water level at Lake Mead.

The district court correctly held that the only relevant question before it for review was whether the Secretary acted arbitrarily and capriciously or abused his discretion in adopting the final RPA. In answering this question, the court had only to determine if the final RPA met the standards and requirements of the ESA. The court was not in a position to determine if the draft RPA should have been adopted or if it would have afforded the Flycatcher better protection.

Upon careful review of the evidence, we cannot say the district court erred in finding that the final RPA met the standards and requirements of the ESA. The district court determined that the FWS considered the relevant factors and reasonably found that the Flycatcher could survive the loss of habitat at Lake Mead for eighteen months until 500 acres could be protected, then survive an additional two years until an additional 500 acres could be protected, and finally survive through the MSCP process until compensation could be made for the historical habitat lost on the Lower Colorado River and until an extensive ecological restoration could be undertaken. Southwest failed to present any convincing evidence to contradict the FWS' findings. Southwest merely relied upon the discarded draft RPA which had indicated that preservation of the Lake Mead habitat was necessary to the survival of the Flycatcher. However, upon further consideration of the matter, the FWS was entitled to, and did, in fact, change its mind. The FWS concluded in the final BO that the proposed short-term and long-term provisions of the final RPA would avoid jeopardy to the Flycatcher, notwithstanding the failure to modify Reclamation's operation of Hoover Dam at Lake Mead. Because there was a rational connection between the facts found in the BO and the choice made to adopt the final RPA, and because we must defer to the special expertise of the FWS in drafting RPAs that will sufficiently protect endangered species, we cannot conclude that the Secretary violated the APA.

Southwest's reliance on this court's decision in *Sierra Club v. Marsh,* 816 F.2d 1376 (9th Cir.1987), is misplaced. In *Marsh,* the FWS concluded that the Corps of Engineers' (COE) project to build a highway and flood control mechanism would jeopardize the continued existence of several bird species by destroying high-quality habitat. *Id.* at 1379.

4. Courts have found agencies to have violated the APA by deviating from an announced policy without sufficient reason. *See California v. FCC,* 905 F.2d 1217, 1230–38 (9th Cir.1990), *vacated on other grounds,* 39 F.3d 919, 930 (9th Cir. 1994). However, neither the Secretary nor the FWS in this case ever adopted the draft RPA, so it never became the official policy of the Secretary. There was consequently no need for the Secretary to state its reasons for adopting a different RPA.

5. The Secretary must rely on "the best scientific and commercial data available" in formulating an RPA, 16 U.S.C. § 1536(a)(2). However, the ESA does not explicitly limit the Secretary's analysis to apolitical considerations. If two proposed RPAs would avoid jeopardy to the Flycatcher, the Secretary must be permitted to choose the one that best suits all of its interests, including political or business interests.

An RPA was consequently adopted to avoid jeopardy to the birds. *Id.* One important provision of the RPA required the COE to acquire and preserve 188 acres of nearby wetlands as replacement habitat. *Id.* When the transfer of the land failed to occur as anticipated, the COE refused to reinitiate consultation with the FWS, as requested, allegedly because it believed that it would eventually obtain the land through litigation with the current land owners. *Id.* at 1381. The COE further refused to halt construction, arguing that the Sierra Club had failed to show that the COE was not likely to acquire these mitigation lands. *Id.* at 1385.

This court ruled in favor of the Sierra Club, holding that COE violated the ESA by failing to ensure that its project did not jeopardize the continued existence of the endangered birds before allowing the adverse impact of its project to accumulate. *Id.* at 1389. Specifically, this court held that "if an agency plans to mitigate its project's adverse effects on an endangered species by acquiring habitat and creating a refuge, it must insure the creation of that refuge before it permits destruction or adverse modification of other habitat." *Id.* By relying only on the outcome of uncertain litigation to provide replacement habitat, the COE had not done enough to make sure that the proposed mitigation measures would occur in time to avoid the jeopardy its actions posed to the endangered birds. *Id.* at 1385.

In this case, by contrast, there has been no violation of any of the terms of the RPA. There has also been no indication that Reclamation cannot acquire and restore the needed replacement habitat as specified in the final RPA by the required deadlines. Moreover, the FWS, which found the RPA insufficient in *Marsh*, fully supports the RPA at issue in this case, and has concluded that the RPA, as written, will avoid jeopardy to the Flycatcher. Thus, quite apart from the *Marsh* case, the RPA in this case insures the creation of replacement habitat, and the survival of the Flycatcher species, before it per-

mits the destruction or adverse modification of the Lake Mead habitat.

We conclude that the district court did not err in holding that the Secretary did not act arbitrarily or capriciously in adopting the final RPA.[6]

AFFIRMED.

---

**6.** We deny as moot the motion by intervenor-appellee Metropolitan Water District of Southern California to take judicial notice of the order in

*Southwest Center for Biological Diversity v. Klasse,* Easter District, No. Civ. S–97–1969 GEB JFM.